IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

COLLEEN PIZZO,

               Plaintiff,

     v.

LINDENWOLD BOARD OF EDUCATION,

               Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 1:13-cv-03633 (JBS/JS)

**OPINION**

APPEARANCES:

Matthew D. Miller, Esq.
Swartz Swidler, LLC
1878 Marlton Pike East, Suite 10
Cherry Hill, NJ 08003
    Attorney for Plaintiff

Timothy R. Bieg, Esq.
Madden & Madden, P.A.
108 Kings Highway East, Suite 200
PO Box 210
Haddonfield, NJ 08033
    Attorney for Defendant

**SIMANDLE, Chief Judge:**

# I.   INTRODUCTION

The Family Medical Leave Act ("FMLA" or "Act") provides employees with up to twelve weeks of unpaid leave per year for certain family and medical reasons. See 29 U.S.C. § 2612(a)(1). In this case, Plaintiff Colleen Pizzo ("Plaintiff") claims that she was fired by her former employer, Defendant Lindenwold Board of Education ("Defendant"), for attempting to take FMLA-

protected leave in March 2013. She claims that her termination violated the FMLA and the New Jersey Law Against Discrimination ("NJLAD"). Defendant has moved for summary judgment on all claims [Docket Item 16] and Plaintiff has moved for partial summary judgment on the claim of FMLA interference [Docket Item 17].

For the reasons set forth below, the Court will grant summary judgment for Defendant on Plaintiff's claims of interference and retaliation under the FMLA, and Plaintiff's claim of discrimination under the NJLAD. Summary judgment will be denied on Plaintiff's claims of failure to accommodate and retaliation for failure to accommodate under the NJLAD.

## II. BACKGROUND

### A. Factual Background[1]

Plaintiff Colleen Pizzo was hired by Defendant Lindenwold Board of Education as a custodian on or about September 2001. (Pizzo Dep., Pl.'s Counter Statement of Material Facts ("Counter SMF") Ex. G [Docket Item 25-2], 30:13-14.) She suffered from "bipolar depression" during her employment with Defendant. (Mar. 9, 2013 Medical Records, Pl.'s Counter SMF Ex. F [Docket Item

---

[1] The facts are drawn from the statements and counterstatements of facts filed in connection with Defendant's motion for summary judgment, Plaintiff's motion for partial summary judgment, and as Defendant's subsequent supplemental submission [Docket Items 28, 30].

2

25-2].) In 2012, Plaintiff's condition was exacerbated by the death of her girlfriend and co-worker in February of that year. (Pizzo Dep. 49:12-50:13.) She missed several consecutive days of work in June 2012 due to her condition. (Attendance Record, Pl.'s Counter SMF Ex. I.) On June 26, 2012, Plaintiff filed a formal FMLA leave request seeking FMLA leave beginning June 19th of that year and ending on July 30. Defendant approved her leave request in full, including for the retroactive dates in her request. (FMLA Request Form, Pl.'s Counter SMF Ex. D; July 25, 2012 Letter to Pl., Pl.'s Counter SMF Ex. J.) While she was out, Plaintiff requested an extension of her leave to September 10, 2012. (Doctor's Notes, Pl.'s Counter SMF Ex. H.)

Defendant's FMLA policy, which was available to employees on its website as well as in hard copy at its main office, states that an employee's twelve-month FMLA cycle begins "after the request for leave."[2] (FMLA Policy, Def.'s Statement of Material Facts ("SMF") Ex. B [Docket Item 16-2], at 1; Huder Dep., Pl.'s Counter SMF Ex. C, 39:22-40:19.) Defendant claims, however, that its policy language does not accurately depict its actual business practice with regards to FMLA-leave allocation.

---

[2] Additionally, Defendant points out that it has FMLA posters up at all of its schools. (Def.'s SMF, ¶¶ 20, 21). However, Defendant does not purport that these posters state Defendant's specific FMLA leave-calculation method.

Vickie Scates, one of Defendant's employees who oversees pension and benefits, testified that rather than measuring twelve months forward from the date an employee *requests* leave, Defendant's customary practice was to calculate its FMLA cycle by measuring twelve months forward from the date an employee *begins* leave. (Scates Dep., Def.'s SMF Ex. G, 14:15–15:14.)

By letter dated September 7, 2012, Kathleen Huder, the School Business Administrator, informed Plaintiff that her twelve weeks of yearly FMLA leave would exhaust on September 10, 2012. Huder testified that she calculated the date by counting twelve weeks from the date Plaintiff began her leave of absence on June 19th, rather than the date she requested leave on June 26th. (Huder Dep. 72:9–73:1.) The letter also stated, "As of August 20, 2012, you have expired all sick, vacation and personal time as well." (Sept. 7, 2012 Letter, Pl.'s Counter SMF Ex. K.) At deposition, Plaintiff stated that she agreed with the letter's statement that her sick, vacation, and personal time had been exhausted. (Pizzo Dep. 69:7–70:5.) Plaintiff returned to work on September 10, 2012. (Pizzo Dep. 68:1–3.)

Following her return to work, Plaintiff continued to miss work, albeit sporadically, undisputedly due to her mental illness. She missed five days of work in December 2012 and January 2013 combined, as well as three days of work in February

2013. (See Attendance Record.) Huder testified at deposition
that Plaintiff was not terminated for these absences because she
provided doctor's notes for these absences and Defendant was
trying to work with her. (Huder Dep. 83:16-84:21.) She stated
that Defendant did not automatically fire employees who were
absent from work for a day when they had no more leave time
left. She explained, "We want our employees to come to work and
do their job and feel better and we were hoping that that would
be the case [with Plaintiff]. So that's why – it's not automatic
day one, dock, you're done." (Id. 84:1-4.)

 Plaintiff was ultimately fired after she accumulated eight
more absences in March 2013. She missed work from March 11th to
March 15th and submitted a doctor's note excusing her absence
due to "work related stress."[3] (Doctor's Notes, Pl.'s Counter SMF
Ex. H.) Plaintiff understood that at the time she missed work,
she had exhausted all her FMLA and sick leave. (Pizzo Dep.
122:21-123:13.) Huder checked Plaintiff's records and saw that
Plaintiff was not eligible for FMLA-covered leave. (Huder Dep.
93:7-24.) On March 12th, Plaintiff submitted a request for a

---

[3] Plaintiff testified that her work related stress was caused by
supplies and other items disappearing at work, as well as issues
with the new principal in the building. (See Pizzo Dep., Pl.'s
Counter SMF Ex. G, 111:8-113:7.)

"sick bank"[4] for "work-related stress." (Request for Sick Bank,
Pl.'s Ex. L [Docket Item 25-2].) Huder recommended denying
Plaintiff's sick bank request "due to [Plaintiff's] abuse of
attendance over the years." (Huder Dep. 68:16-18; 70:19-24.)
Plaintiff's request was discussed at Defendant's board meeting
on March 27, 2013 and was ultimately denied. (Termination
Letter, Pl.'s Counter SMF Ex. M [Docket Item 25-2].) The
following week, Plaintiff missed work on March 18th and 19th and
submitted another doctor's note excusing her absences. (Doctor's
Notes, Pl.'s Counter SMF Ex. H.)

Plaintiff returned to work on March 20th but called out of
work again on March 21st. That day, Plaintiff had a telephone
conversation with her supervisor, Jerome Juvennelliano.
According to Juvennelliano, Plaintiff stated that she was "not
coming in anymore." Juvennelliano told Plaintiff, "Okay. You
have to get a doctor's note," but Plaintiff responded, "No. I am
not coming in anymore." (Juvennelliano Dep., Def.'s SMF Ex. M
[Docket Item 16-2] 18:16-24.)[5] Juvennelliano spoke with Huder and
relayed what Plaintiff said. Huder testified, "When I saw Jerome

---

[4] A sick bank is a mechanism in which other employees can donate
their unused paid sick days to the sick employee. Defendant permits
its employees to apply for a sick bank upon exhausting all of their
paid sick days.
[5] Plaintiff does not appear to dispute this. (See Pl.'s Resp. to
Def.'s SMF [Docket Item 25-3] ¶ 44) ("Plaintiff admits that this
was Supervisor Juvennelliano's testimony.").

later that day, I reviewed it with him again and I said, This is what she said? And he said, Yes. So I made sure that the communication that I was relayed was accurate." (Huder Dep. 94:17-24.) Defendant did not reach out to Plaintiff to confirm her statement.

Plaintiff asserts that she called out sick on March 21st because "of [her] depression and anxiety" and intended to go back to work on April 2nd. She states that she told Juvennelliano over the phone that she "was calling out sick" and that her doctor would fax a letter to Defendant. She specifically testified that she did not tell Juvennelliano the specific condition she had; she "just told him [she] was calling out sick." (Pizzo Dep., Pl.'s Counter SMF Ex. G, 129:15-21.) Although Plaintiff admits that she did not tell Juvennelliano when she would be returning to work, she did not recall saying that she would be out indefinitely. She asserts that she asked her physician, Dr. Frank Murphy, for a note excusing her from work for that time period but her doctor never sent the note. (Pizzo Dep. 125:16-126:25.)

Plaintiff had a medical visit with Dr. Henry T. Dombrowski on March 21st. According to his medical records, Plaintiff arrived "tearful and emotionally upset." Dr. Dombrowski noted that Plaintiff "has worked in housekeeping with [Defendant] for

13 years" and that she "clashes with her boss and has been out of work." Dr. Dombrowski noted that he was not comfortable treating Plaintiff's psychiatric problems and "suggested that returning to her current employer and work situation is likely to be problematic in the future if she clashes with her boss." (Dombrowski record, Supplemental Def. Ex. [Docket Item 28-1].)

Plaintiff did not return to work after that phone call.[6] Huder testified that because Plaintiff had called saying "that she would be out indefinitely, you know, that basically brought me to the decision that we need people to come to work and we need to finalize our employment with her." (Huder Dep. 84:9-15.) She further testified that the decision to terminate Plaintiff was made "because [Plaintiff] had been out for so many days and because she represented to us that basically, I'm out and I don't know when I'm coming back. That is specifically why in this case it ended in termination." (Id. 85:2-7.)

Defendant fired Plaintiff by phone and by letter dated March 28, 2013. The letter stated that Defendant was terminating Plaintiff's employment "as [Plaintiff] has exhausted all accrued

---

[6] A few days after her phone call to Juvennelliano, Plaintiff called Scates asking when her benefits would "term" or cease. (Pizzo Dep. 132:8-16.) Plaintiff testified that she called to ask when her benefits would end due to her inability to cover the deductions required so that she could get health insurance at the appropriate time. (Pizzo Dep. 132:7-133:12.)

time and FMLA and [has] given notice that she will be out indefinitely." (Termination Letter, Pl.'s Counter SMF Ex. M.)

Prior to her termination, Plaintiff had never been disciplined by Defendant for her absences, other than single attempt in February 2013 which Defendant later retracted. (Pizzo Dep. 128:4-23.)

On April 8, 2013, more than a week after Plaintiff's termination, Defendant received a letter from Plaintiff's physician, Dr. Murphy, dated March 28, 2013. The letter explained that Plaintiff "attempted to return to work on March 20, but was unable to perform her duties due to her medical condition." The letter further advised that Plaintiff needed to take a leave of absence "[d]ue to her medical condition and level of symptoms." The letter did not contain a return-to-work date but requested leave for an indefinite period of time. (Dr. Murphy Letter, Pl.'s Ex. P [Docket Item 25-2].)

**B. Procedural History and Parties' Arguments**

Plaintiff filed her Complaint on June 11, 2013 [Docket Item 1]. She brings claims against Defendant for interference and retaliation under the FMLA as well as discrimination, retaliation, and failure to accommodate under the NJLAD. (Compl. ¶¶ 25-59.) This Court exercises subject matter jurisdiction over

Plaintiff's federal and state law claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

Plaintiff asserts that her March 2013 absences were covered under the FMLA, and that Defendant encroached upon her rights by firing her for attempting to take an FMLA-protected leave of absence. (Id. at ¶¶ 26-38.) Plaintiff also claims that she is disabled within the meaning of the NJLAD, and that Defendant failed to accommodate her disability, retaliated against her for requesting a reasonable accommodation, and fired her on the basis of her disability. (Id. at ¶¶ 40-59.)

Defendant filed a motion for summary judgment on all counts. Plaintiff filed a cross-motion for summary judgment on her FMLA interference claim.

With respect to the FMLA claims of interference and retaliation, Defendant argues that terminating Plaintiff did not violate the FMLA because she had no remaining FMLA benefits in by March 21, 2013. (Def.'s Summ. J. Br. [Docket Item 16-1], at 8.) Defendant argues that, according to its policies with regards to leave-calculation, Plaintiff's twelve-month FMLA cycle began when she took her leave of absence on June 19, 2012 and did not replenish until June 2013. (Id. at 12, 13.) Since Plaintiff had already used twelve weeks of leave in the summer of 2012, she had no available leave time to cover her prolonged

absences in March 2013. (Id.) Defendant additionally argues that Plaintiff's FMLA claims must be dismissed because Plaintiff gave insufficient notice that she was invoking her FMLA rights.

In opposition to Defendant's motion and in support of her own motion for partial summary judgment on the FMLA interference claim, Plaintiff contends that she was entitled to FMLA leave in March 2013. She claims that Defendant failed to adopt a method of leave-calculation because its policy language does not perfectly mirror any of the methods prescribed by the regulations. (Pl.'s Opp. Summm. J. [Docket Item 25], at 8–10; Pl.'s Partial Summ. J. Br. [Docket Item 17-1], at 8-9.) Plaintiff argues that this discrepancy, according to § 825.200(e), is akin to not choosing a leave-calculation method at all, and entitles her to use the prescribed method which provides the best outcome for her. (Id.) Under the "calendar year" method found in § 825.200(b)(1), Plaintiff's available leave would have replenished in January 2013. Thus, she would have had available FMLA leave in March 2013, and Defendant violated her rights under the FMLA by terminating her. Alternatively, Plaintiff argues that even if Defendant properly chose a leave-calculation method, it did not provide its employees, Plaintiff included, with sufficient notice of its choice of methods. (Pl.'s Opp. Summ. J., at 10-11.)

11

With regards to the NJLAD claims, Defendant argues summary judgment is warranted because Plaintiff could not perform the duties of her employment, even with a reasonable accommodation. (Def.'s Summ. J. Br., at 13, 14-15.) Defendant also asserts that it had no discriminatory intent. (Id. at 15.)

Plaintiff contends in opposition that she requested two alternative accommodations, both of which were reasonable: a leave of absence and a sick bank. (Pl.'s Opp. Summ. J., at 17-18.) She argues that Defendant discriminated and retaliated against her by firing her because of her disability and because she sought an accommodation. (Id.)

III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute is considered "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Furthermore, a fact is only "material" if it might affect the outcome of the suit under the applicable rule of law. Id. At summary judgment, the Court views the evidence in favor of the nonmoving party and extend any reasonable inferences to

be drawn from that evidence to that party. <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999).

This standard remains unchanged when the Court is presented with cross-motions for summary judgment. <u>See</u> <u>United States v. Kramer</u>, 644 F. Supp. 2d 479, 488 (D.N.J. 2008). The Court must consider the cross-motions independently and "view the evidence on each motion in the light most favorable to the party opposing the motion." <u>Id.</u> (citing <u>Williams v. Phila. Housing Auth.</u>, 834 F.Supp. 794, 797 (E.D. Pa. 1993), <u>aff'd</u>, 27 F.3d 560 (3d Cir. 1994)).

## IV.  DISCUSSION

### A. Plaintiff's FMLA claims

The express purpose of the FMLA is "to balance the demands of the workplace with the needs of families" by establishing a minimum labor standard for leave for certain family and medical reasons. 29 U.S.C. § 2601(b)(1); <u>Churchill v. Star Enters.</u>, 183 F.3d 184, 192 (3d Cir. 1999). Leave is covered under the FMLA if an employee has a "serious health condition that makes the employee unable to perform the functions" of his or her job. 29 U.S.C. § 2612(a)(1)(D). If an employee is eligible, he or she is entitled to twelve weeks of leave during a given twelve-month period, as well as reinstatement to his or her original position or its equivalent. <u>Id.</u> § 2614(a)(1). Employers may not deny

13

leave to employees who qualify, nor may they retaliate against employees who exercise their rights under the FMLA. Id. § 2615(a)(1).

Although the FMLA allows employees to take reasonable leave for medical reasons, it also requires that all such leave be taken "in a manner that accommodates the legitimate interests of employers." Id. § 2601(b)(3). Accordingly, employers have some discretion in determining when their employees' twelve-month benefit period begins. Specifically, federal regulations give employers four choices for calculating their yearly FMLA cycle:

> (1)  The calendar year;
>
> (2)  Any fixed 12-month leave year, such as a fiscal year, a year required by State law, or a year starting on an employee's anniversary date;
>
> (3)  The 12-month period measured forward *from the date of any employee's first FMLA leave* [taken pursuant to 29 C.F.R. § 825.200(a)]; or,
>
> (4)  A "rolling" 12-month period measured backward from the date an employee uses any FMLA leave as described in [29 C.F.R. § 825.200(a)].

29 C.F.R § 825.200(b)(1)-(4) (emphasis added). Employers retain the flexibility to choose which calculation method to apply as long as they apply it consistently and uniformly to all employees. Id. § 825.200(d)(1). Importantly, if an employer fails to select one of the regulations' appropriated methods, "the option that

14

provides the most beneficial outcome for the employee will be used." § 825.200(e).

29 U.S.C. § 2615(a)(1) of the FMLA prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" that it guarantees. "Interference" includes "[a]ny violations of the [FMLA] or of these [FMLA] regulations." 29 C.F.R. § 825.220(b). To assert a claim for interference under the FMLA, an employee need only to show that "he was entitled to benefits under the FMLA and that he was denied them." Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. §§ 2612(a), 2614(a)). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Id. at 120.

While § 2615(a)(1) prohibits interference with employees' FMLA rights, § 2615(a)(2) prohibits employers from discriminating against employees who have taken FMLA leave. 29 U.S.C. § 2615(a)(2). Section (a)(2) prohibits an employer "from discriminating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). An employer also cannot use the taking of FMLA leave as "a negative factor in employment actions, such as hiring, promotions or

15

disciplinary actions." <u>Id.</u>; <u>see also</u> <u>Hodgens v. Gen. Dynamics Corp.</u>, 144 F.3d 151, 159-60 (3d Cir. 1998). To establish a claim of discrimination under § 2615(a)(2), a plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the plaintiff's FMLA leave. <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 146-47 (3d Cir. 2004).

Once a prima facie case has been established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 342 (3d Cir. 2006); <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500-01 (3d Cir. 1997). The burden then shifts back to the plaintiff, who must show that the employer's proffered explanation was pretext and that the employer's real reason for retaliating against her was because she took FMLA-protected leave. <u>Hodgens</u>, 144 F.3d at 161; <u>Thurston v. Cherry Hill Triplex</u>, 941 F.Supp.2d 520, 532 (D.N.J. 2008).

"[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." <u>Erdman v. Nationwide</u>

16

Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009); see also

Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294 (3d

Cir. 2012).

Plaintiff seeks summary judgment on her interference claim,

arguing that her absence on March 21, 2013 was FMLA-protected,

and that her termination for that absence therefore violated

§ 2615(a)(1). Defendant moves for summary judgment against

Plaintiff's claims of interference and retaliation, arguing that

Plaintiff had exhausted her FMLA leave by March 2013 and that no

reasonable jury could find that Defendant interfered with or

deprived Plaintiff of any FMLA-protected right.

    1. The Court will grant summary judgment in Defendant's
favor on Plaintiff's FMLA interference claim

The parties do not contest that Plaintiff was terminated on

March 28, 2013 for her absence on March 21st, but they sharply

dispute whether Plaintiff's absence on March 21st was protected

under the FMLA. That question in turn hinges on which of the

four methods of leave calculation set forth in 29 C.F.R §

825.200(b)(1)-(4) should be used to calculate Plaintiff's

entitlement to leave.

The evidence is not so clearly one-sided such that a jury

must find in favor of one party. A reasonable jury could find,

based on Vickie Scates' testimony, that Defendant measured the

twelve-month period from the date the employee begins leave and therefore adopted the "looking forward" leave calculation specified in § 825.200(b)(3). Under that calculation, Plaintiff's absences in March 2013 would not have been FMLA-protected, and a reasonable jury could therefore find that Defendant did not deny her any entitlement under the FMLA.

A reasonable jury could also disregard Scate's testimony in favor of Defendant's official FMLA policy, which clearly states that the twelve-month FMLA cycle begins "after the request for leave." A reasonable juror could conclude, particularly when viewing the evidence in light most favorable to Plaintiff, that by promulgating a written policy which does not conform to any of the specified methods under § 825.200(b), Defendant "failed to select one of the [specified] options," and Plaintiff must be given the benefit of the most beneficial leave outcome. 29 C.F.R. § 825.200(e) (stating that "[i]f an employer fails to select one of the options in paragraph (b) . . . for measuring the 12-month period for the leave entitlements . . ., the option that provides the most beneficial outcome for the employee will be used."). Under § 825.200(b)(1), the "calendar method," Plaintiff would be entitled to twelve weeks of leave beginning each new calendar year. Plaintiff's FMLA-related absences in

2012 would not count towards her leave in 2013, and her March 21, 2013 absence would therefore be covered by the FMLA.

If Plaintiff's interference claim turned solely on whether she was entitled to benefits under the FMLA on March 21st, summary judgment would be inappropriate for either party. However, in order to invoke the FMLA's protection for an interference claim, Plaintiff must also show that she gave sufficient notice to her employer that she was requesting leave under the FMLA. In this case, the Court agrees with Defendant that Plaintiff's notice was inadequate to alert Defendant that she was invoking her FMLA rights. (Def. Mot. for Summ. J. [Docket Item 16-1] at 10.)

29 C.F.R. § 825.303(b) requires an employee to provide "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b); see also Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294, 303 (3d Cir. 2012); Brenneman v. MedCentral Health Syst., 366 F.3d 412, 421 (6th Cir. 2004) ("[T]he critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job."). Moreover, when

leave is requested for an FMLA-qualified reason which the employer has previously allowed, the employee "must specifically reference either the qualifying reason for leave or the need for FMLA leave." 29 C.F.R. § 825.303(b). Significantly, the FMLA regulations provide that "[c]alling in "sick" without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." 29 C.F.R. § 825.303(b).

Plaintiff provided no notice that would be acceptable under § 825.303. On the morning of March 21st, Plaintiff called her supervisor, Jerome Juvennelliano, to tell him she would not be coming in. She stated that she told Juvennelliano that she "was calling out sick." At deposition, Plaintiff was asked specifically whether she told Juvennelliano about her medical condition or "what was going on requiring [her] to miss work." She responded, "No, I just told him I was calling out sick." Plaintiff also admitted that she never told Juvennelliano the date on which she would be returning to work. Juvennelliano recalled Plaintiff telling him only that she was "not coming in." He did not recall Plaintiff giving any more detail. There is no evidence in the record that Plaintiff conveyed to Defendant that her sickness was due to depression or another serious illness which may be protected under the FMLA.

Nor is there any evidence that Defendant received other notice from Plaintiff in the days after March 21st. Plaintiff did not return to work after that day and she specifically testified that her physician never sent her employer a doctor's note about her ailment. Although Defendant eventually received a letter from Dr. Murphy excusing Plaintiff for her absence, the letter was dated March 28th, the same day Plaintiff was fired, and was not received by Defendant until April 8th.

In short, giving Plaintiff the benefit of all favorable inferences, the only information Defendant received from Plaintiff about her March 21st absence before it fired her was Plaintiff's statement that she was "calling out sick." Such an explanation is not enough as a matter of law to convey to Defendant that Plaintiff was suffering from a serious medical illness, nor was it enough to trigger Defendant's obligation to ask for additional information. 29 C.F.R. § 825.303(b). Compare Lichtenstein, 691 F.3d at 304 (finding that plaintiff gave sufficient notice of her intention to take FMLA-qualified leave when she told employer that she was unable to come to work; was in the emergency room; and her mother had been brought to the hospital via ambulance) and Viereck v. City of Gloucester City, 961 F. Supp. 703, 707 (D.N.J. 1997) (holding the plaintiff's notice to her employer sufficient under the FMLA because

21

"[a]lthough plaintiff did not mention the FMLA by name at that time, she described the nature and extent of her injuries to [her employer], informed him that she had been hospitalized, and told him that she would be unable to return to work for some time due to her medical condition") with Satterfield v. Wal-Mart Stores, Inc., 135 F.3d 973, 978-81 (5th Cir. 1998) (rehearing and rehearing en banc denied) (holding, as a matter of law, that an employee's statement that she "was having a lot of pain and . . . wouldn't make it in to work that day" provided insufficient notice to her employer under the FMLA); Ireland v. Borough of Haddonfield, at *4-5 & n.5 (D.N.J. Sept. 1, 2006) (plaintiff did not provide sufficient notice to employer of intention to take FMLA-qualified leave when he failed to articulate the nature of his serious medical condition); see also Sherrod v. Pa. Gas Works, 57 Fed. App'x 68, 72-73 (3d Cir. 2003) (notice was not given given where employee failed to sufficiently explain her reasons for the leave so as to allow her employer to determine that her request was covered by the FMLA).

Because no reasonable factfinder could conclude that Plaintiff gave sufficient notice that she was taking FMLA-protected leave on March 21st, the Court will grant summary judgment in Defendant's favor on Plaintiff's claim of interference under the FMLA. Plaintiff's motion for partial

22

summary judgment on the interference claim will accordingly be denied.

      2. <u>Summary judgment will be granted for Defendant on the claim of retaliation under the FMLA</u>

    Summary judgment is warranted in Defendant's favor on Plaintiff's claim of FMLA retaliation. First, as noted above, no rational jury could find that Plaintiff provided Defendant with sufficient notice to trigger her FMLA rights.

    Additionally, Defendant has proffered a legitimate, non-retaliatory reason for Plaintiff's termination which Plaintiff has failed to rebut. Defendant asserts that it fired Plaintiff because it did not know when Plaintiff would be returning to work, and the evidence supports that Plaintiff left on March 21st with no firm return date. Juvennelliano testified that Plaintiff told him that she was "not coming in anymore." Although Plaintiff asserts that she told Juvennelliano that she was merely "sick," she nevertheless admitted at deposition that she did not tell Juvennelliano when he could expect her back at work. Additionally, the March 21st medical record from Dr. Dombrowski indicates that Plaintiff was having difficulties with her supervisor at work, and his advice to Plaintiff that returning to work would be "problematic" suggests that Plaintiff was contemplating an indefinite leave for non-medical reasons. Likewise, Katherine Huder testified that her understanding from

23

speaking with Juvennelliano was that Plaintiff had said she would be out "indefinitely." She further testified that while Defendant could be flexible with employees about taking sick days when they had used up their leave – and indeed, had been flexible with Plaintiff with respect to her absences in early 2013 – Plaintiff's phone call on March 21st indicated that this was not Plaintiff's situation, and Plaintiff's uncertain return date was the reason why she was fired. (See Huder Dep. 85:2-7 ("[S]he represented to us that basically, I'm out and I don't know when I'm coming back. That is specifically why in this case it ended in termination.").)

Plaintiff has supplied no evidence demonstrating that Defendant's proffered legitimate, nondiscriminatory reason was pretextual. Plaintiff's only argument for pretext is that her absence was for medical reasons and was clearly protected by the FMLA. But, as the Court has already explained, no reasonable jury could find that Defendant was even aware that Plaintiff was invoking her FMLA rights. Plaintiff's argument is also undermined by the fact that both parties believed at the time that Plaintiff was not entitled to any more FMLA leave. Indeed, Plaintiff testified that she believed that she had exhausted all of her FMLA leave in March 2013. (See Pizzo Dep. 123:10-13.) To discredit the defendant's reasons, the plaintiff "cannot simply

show that the employer's decision was wrong or mistaken," since the factual dispute at issue is not whether the employer was competent, but whether discriminatory animus motivated the adverse decision. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). No reasonable jury could find that Defendant terminated Plaintiff for attempting to take FMLA leave to which it believed she was entitled. Because Plaintiff has not otherwise met her burden of showing that Defendant's proffered explanation is unworthy of credence, the Court will grant summary judgment and dismiss Plaintiff's claim of retaliation under the FMLA.

**B. The NJLAD claims**

The New Jersey Law Against Discrimination ("NJLAD") prohibits employers from discriminating against employees on the basis of disability. Section 10:5-12(a) makes it unlawful for an employer to discriminate against an individual because of that person's disability. N.J.S.A. § 10:5-12(a). Section 10:5-12(d) of the NJLAD prohibits retaliation against an employee because that employee "has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD.]" N.J.S.A. § 10:5-12(d); Cortes v. Univ. of Med. & Dentistry of N.J., 391 F.Supp. 2d 298, 314 (D.N.J. 2005).

Plaintiff makes three claims under the NJLAD: she claims that she was terminated because of her disability; that Defendant failed to accommodate her disability; and that Defendant retaliated against her for requesting an accommodation.

1. Summary judgment is warranted on Plaintiff's claim of discriminatory discharge

To prove a claim of discriminatory discharge under the NJLAD, a plaintiff must prove that (1) she was in a protected class; (2) she was otherwise qualified and performing the essential functions of the job; (3) she was terminated; and (4) the employer thereafter sought a similarly qualified individual for the job. Victor v. State, 203 N.J. 383, 409 (2010) (internal citations omitted).

The burden-shifting framework used in the FMLA retaliation context also applies here. Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to show a legitimate non-discriminatory reason for its actions. Dixon v. Rutgers, The State Univ. of N.J., 541 A.2d 1046, 1051 (N.J. 1988) (citing McDonnell Douglas, 411 U.S. at 807). The burden then shifts back to the plaintiff to prove that the defendant's proffered reason was merely a pretext for discrimination. Id. The plaintiff may meet this burden by showing that a discriminatory reason more likely motivated the

26

employer than the employer's proffered non-discriminatory reason or by showing that the employer's proffered explanation is unworthy of credence. Bergen Comm'l Bank v. Sisler, 157 N.J. 188, 211 (N.J. 1999) (citing Murray v. Newark Housing Auth., 709 A.2d 340 (N.J. Super. Ct. Law Div. 1998)).

The parties do not dispute that Plaintiff was disabled within the meaning of the NJLAD due to her diagnosis for "bipolar depression" or that she was fired due to her March 21st absence, which Plaintiff asserts was for "depression and anxiety." Plaintiff also argues that she was qualified to perform the essential functions of her job. Plaintiff had no disciplinary record, had not been disciplined for her absences leading up to March 21st, and nothing in the evidence suggests that Defendant was unsatisfied with Plaintiff's work performance. However, Plaintiff has not set forth any evidence – and the Court can find none in the record – nor even argued that Defendant sought a similarly qualified individual for the job after Plaintiff was fired. Thus, Plaintiff has not satisfied the prima facie case for disability discrimination.

The Court must also grant summary judgment because Defendants have proffered a legitimate, nondiscriminatory reason for Plaintiff's termination which Plaintiff has failed to rebut. As the Court has already explained above, Plaintiff's own

testimony and the testimonies of Juvennelliano and Huder suggest that Plaintiff was ultimately terminated because Defendant did not know when Plaintiff would be coming back to work. Although Plaintiff testified that she had been planning to return on April 2, nothing in the record suggests that the date was communicated to Defendant. Defendant's impression at the time, and why it chose to terminate Plaintiff, was that Plaintiff's absence was indefinite. Plaintiff argues that one of Defendant's stated reasons for Plaintiff's termination was that she had exhausted her sick leave,[7] but that alone does not raise an inference of discriminatory animus. Moreover, Plaintiff fails to note that the termination letter also stated that it was firing Plaintiff because of Plaintiff's statement that she would be out "indefinitely." Even viewed in light most favorable to Plaintiff, no reasonable juror could find that Defendant's proffered reason for terminating Plaintiff's employment was pretext for discrimination. Accordingly, the Court will grant summary judgment on Plaintiff's claim of discriminatory termination.

 2. The Court will deny summary judgment on Plaintiff's NJLAD claims of failure to accommodate and deny summary

---

[7] In Plaintiff's termination letter, Defendant had written that Plaintiff was being fired because she had exhausted her FMLA and sick leave and had given notice that she would be out indefinitely.

<u>judgment on Plaintiff's claim of retaliation for failure
to accommodate</u>

Failure to accommodate "is one of two distinct categories
of disability discrimination claims ... the other being
disparate treatment discrimination." <u>Victor v. State</u>, 952 A.2d
493, 501 (N.J. Super. Ct. App. Div. 2008). Under the NLJAD, an
employer must "make a reasonable accommodation to the
limitations of an employee or applicant who is a person with a
disability, unless the employer can demonstrate that the
accommodation would impose an undue hardship." N.J. Admin. Code
tit. 13, § 13-2.5; <u>see</u> <u>also</u> <u>Soules v. Mt. Holiness Mem'l Park</u>,
808 A.2d 863, 867 (N.J. Super Ct. App. Div. 2002); <u>Barboza v.
Greater Media Newspapers</u>, 2008 WL 2875317, at *2 (D.N.J. July
22, 2008). Under New Jersey Law, a reasonable accommodation may
take the form of a temporary leave of absence. <u>See</u> N.J. Admin.
Code 13:13-2.5(b)(1)(ii); <u>Santiago v. Cnty. Of Passaic</u>, 2009 WL
483159, at *6 (N.J. Super. Ct. App. Div. Feb. 27, 2009).

A prima facie case of failure to accommodate requires proof
that (1) the plaintiff was disabled within the meaning of the
NJLAD; (2) was qualified to perform the essential functions of
the job, with or without accommodation; and (3) she suffered an
adverse employment action because of the handicap. <u>Bosshard v.
Hackensack Univ. Med. Ctr.</u>, 783 A.2d 731, 739 (N.J. Super. Ct.
App. Div. 2001). In addition, the plaintiff must establish

29

several elements that go to the second factor of the prima facie
case. To show that an employer failed to participate in the
interactive process, and thereby has failed to provide
reasonable accommodations, a disabled employee must demonstrate:
(1) the employer knew about the employee's disability; (2) the
employee requested accommodations or assistance for her
disability; (3) the employer did not make a good faith effort to
assist the employee in seeking accommodations; and (4) the
employee could have been reasonably accommodated but for the
employer's lack of good faith." Tynan v. Vicinage 13 of Super.
Ct., 798 A.2d 648, 657 (N.J. Super. Ct. App. Div. 2002). Once a
request for accommodation is made, both parties have a duty to
assist in the search for an appropriate reasonable
accommodation. Tynan, 798 A.2d at 657.

Plaintiff contends that she requested two reasonable
accommodations which Defendant denied: a leave of absence on
March 21st and a sick bank on March 12th. (Pl. Opp. Summ. J. 17-
18.)

First, with respect to the alleged request for a leave of
absence, Plaintiff did not in fact request a leave of absence
prior to her termination. She merely called in "sick" on March
21st without further explanation and without any request that a
reasonable juror could construe as a request for a leave of

absence. See Armstrong v. Burdette Tomlin Memorial Hosp., 438
F.3d 240, 247 (3d Cir. 2006) (noting that employee requested
accommodation when she "made her handicap known and announced
her desire for assistance"); Tynan, 798 A.2d at 656-67 (noting
that while an employee may use "plain English and need not
mention the ADA or any other legal source requiring
accommodation," she must " 'make clear' "that assistance is
desired for her disability) (quoting Jones v. United Parcel
Serv., 214 F.3d 402, 408 (3d Cir.2000)). Indeed, the record is
undisputed that Plaintiff did not mention her disability at all
in her phone call to Defendant. Although Plaintiff's doctor
requested a leave of absence by letter dated March 28th,
Defendant did not receive this letter until more than a week
after firing Plaintiff. No reasonable jury could find that
Plaintiff made a clear request for a leave of absence for her
bipolar depression prior to being terminated, and the Court
finds that Plaintiff's failure to accommodate claim on this
theory must be dismissed.

However, there is evidence from which a reasonable jury
could conclude that Defendant failed to accommodate Plaintiff
for her disability when it denied her request for a sick bank. A
reasonable jury could find that Plaintiff made a clear request
for assistance for her disability when she asked Defendant on

March 12th for sick bank time for her "work-related stress." She
then submitted doctor's notes related to her subsequent
absences. Rather than engage Plaintiff in an interactive process
to find an acceptable accommodation, Defendant never
communicated with Plaintiff regarding her sick bank request or
her doctor's notes, and denied her request with no explanation
on March 28, 2013, the same day it fired her. A reasonable jury
could therefore find that Defendant's failure to communicate
with Plaintiff was a bad faith response to Plaintiff's request
for an accommodation. See Church v. Sears Holding Corp., 2014 WL
2115020, at *12 (D.N.J. May 21, 2014) (noting that acting in
good faith may be demonstrated by helping the other party
determine what specific accommodations are necessary and
communicating with the other party, by way of initiation or
response) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d
296, 313 (3d Cir. 1999)). The fourth prong is also satisfied.
Although an employee is not entitled to an indefinite amount of
leave, the end of which an employer cannot foresee, see Nusbaum
v. CB Richard Ellis, Inc., 171 F. Supp. 2d 377, 388 (D.N.J.
2001), the grant of a short amount of sick bank would not have
been an unreasonable accommodation. See Linton v. L'Oreal USA,
2009 WL 838766, at *8 (D.N.J. Mar. 27, 2009) (denying summary
judgment on failure to accommodate claim where there was some

32

evidence that employer could have granted employee a "short extension of leave" on Defendant's eight-week injury). Because a reasonable jury could find that Plaintiff requested an accommodation by seeking some sick bank time for her disability and Defendant failed to communicate with Plaintiff regarding her sick bank request before terminating her employment, the Court will deny summary judgment on Plaintiff's claim of failure to accommodate.

Finally, Plaintiff argues that Defendant terminated her because she requested a reasonable accommodation, which constitutes retaliation under the NJLAD. The NJLAD makes it unlawful "[f]or any person to take reprisals against any person because he has opposed any practices or acts forbidden [under the Act] . . . or because he has filed a complaint, testified or assisted in any proceeding [under the Act]." N.J.S.A. 10:5-12(d). To establish a prima facie case of retaliation, Plaintiff must demonstrate by a preponderance of the evidence that (1) she engaged in protected activity – here, a request for a reasonable accommodation; (2) she suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action. Romano v. Brown & Williamson Tobacco Corp., 665 A.2d 1139, 1142 (N.J. Super. Ct. App. Div. 1995). Retaliation claims under the NJLAD are analyzed under the same burden-

shifting framework used for claims under the FMLA. See Lawrence
v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 70 (3d Cir.
1996); Thurston v. Cherry Hill Triplex, 941 F.Supp.2d 520, 534–
35 (D.N.J. 2008).

Plaintiff has shown a prima facie case of retaliation: she
engaged in protected activity by making a request for a sick
bank on March 12th, and she was terminated 16 days later on
March 28th, the same day she was notified that her request for a
sick bank was denied. Defendant argues that "the undisputed
reason" for Plaintiff's termination was her "excessive
absenteeism in the month leading up to her removal." (Def. Mot.
for Summ. J. [Docket Item 16-1] 17.) Defendant also argues that
there is no close temporal proximity between Plaintiff's
protected activity and her termination because Plaintiff did not
request and was not eligible to take leave in March. Defendant
argues that the only "protected activity" in this instance was
the leave Plaintiff was entitled to take in the summer of 2012,
and nearly one-year gap between the protected activity and
Plaintiff's termination does not establish any temporal
proximity. (Id.; Def. Reply in Support of Mot. for Summ. J.
[Docket Item 26] 4-5.)

The Court is not persuaded by Defendant's reasoning. As
Plaintiffs have argued, for purposes of the NJLAD, the protected

34

activity Plaintiff engaged in here was her request for a sick bank, which qualified as a request for a reasonable accommodation. Plaintiff made the request on March 12th and was terminated 16 days later. Such "close temporal proximity qualifies as unusually suggestive timing" and is evidence of a causal connection between Plaintiff's request and her termination. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 285 (3d Cir. 2000) (finding that time of three to four weeks between protected activity and termination was "suggestive" of retaliation in Title VII retaliation context); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007) (employee who was notified of her termination three months after requesting FMLA leave and the day she was scheduled to return to work established a causal connection); LaFranco v. Avaya Inc., 2009 WL 2850747, at *9 (N.J. Super. Ct. App. Div. 2009) (noting that temporal proximity alone is sufficient to establish a causal link under the NJLAD).

Moreover, there is some evidence that Defendant's proffered nondiscriminatory reason for firing Plaintiff – Plaintiff's absenteeism from work and her purported statement that she would be taking indefinite leave – was pretext. Here, Plaintiff requested a sick bank for her disability and never heard back about whether her request would be granted until the day she was

fired. The fact that Defendant failed to engage with Plaintiff about her request, never bothered to respond to Plaintiff's request until she was fired, gave no explanation for why it was denying Plaintiff's request, and terminated Plaintiff only two weeks after she asked for sick bank is sufficient to raise a genuine issue of fact as to whether the true reason for Plaintiff's termination was retaliation for requesting a reasonable accommodation for her disability under the NJLAD.

**V.   CONCLUSION**

For the foregoing reasons, the Court will grant summary judgment on Plaintiff's claims of interference and retaliation under the FMLA, and Plaintiff's claim of discriminatory discharge under the NJLAD. Summary judgment will be denied on Plaintiff's claim of failure to accommodate and retaliation under the NJLAD with respect to Plaintiff's request for a sick bank. An accompanying Order will be entered.


 **March 31, 2015**                           **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                             Chief U.S. District Judge